## A. FRANCIS v. STATE.

No. A-3618.   Opinion Filed Dec. 21, 1922.
(211 Pac. 433.)

(Syllabus.)

1. Homicide—Insufficiency of Evidence—Setting Aside Conviction on Motion for New Trial.—In a homicide case where there is substantial evidence tending to show that the prosecuting witness and not the accused fired the fatal shot, and independent of such showing the evidence against the accused is of doubtful probative force, the conviction should be set aside as not being supported by sufficient evidence.

   (a) Under such circumstances, the verdict should have been set aside by the trial court on the motion for a new trial.

2. Trial—Requiring Jury to Continue Deliberations for 96 Hours not Coercion.—In a homicide case where the testimony of a large number of witnesses is heard, involving many questions of fact relating to motive, impeachment, credibility of witnesses, the identity of weapons, and physical conditions surrounding the difficulty, we cannot say that the trial court abused his discretion in requiring the jury to continue their deliberations for 96 hours before reaching a verdict; such period of deliberation did not, under the circumstances, amount to coercion.

3. Trial—Exclusion of Evidence—Insufficient Offer of Proof.—The trial court committed no error in the exclusion of evidence, as recited in the opinion, where no sufficient showing was made as to what the defendant expected to prove by the testimony of the witness.

Appeal from Superior Court, Creek County; Gaylord R. Wilcox, Judge.

A. Francis was convicted of the crime of manslaughter in the first degree, and he appeals. Reversed and remanded.

J. P. O'Meara, Chas. E. Bush, and A. F. Moss, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall, Asst. Atty. Gen., for the State.

BESSEY, J.   A. Francis, plaintiff in error, hereinafter referred to as the defendant, was on the 2d day of August, 1918, by information filed in the superior court of Creek county charged jointly with John Francis with the murder of Sadie Naufal on May, 1, 1918.   The defendants were tried jointly, resulting in a verdict of the jury, February 25, 1919, finding defendant A. Francis guilty of manslaughter in the first degree, without assessing the punishment, and acquitting his codefendant John Francis.   After the overruling of a motion for a new trial, the court pronounced judgment on the verdict rendered, fixing defendant's punishment at confinement in the state penitentiary for a term of 10 years.   From this verdict and judgment defendant A. Francis appeals.

The record shows that defendant A. Francis and John Francis, his son, and E. Naufal and Sadie Naufal, his wife, were Syrians; that the defendants and E. Naufal were engaged in the mercantile business in Drumright, Creek county, Okla., with places of business on the same street, on opposite sides of the street; that John Francis and E. Naufal were brothers-in-law, having married sisters.   It appears further that John Francis and another Syrian were joint tenants of property belonging to E. Naufal, and that E. Naufal had instituted suit in justice court against John Francis and his cotenant for rent due, which suit was set for trial in justice court at 2 o'clock on May 1, 1918, the day of the tragedy; that earlier in this day, on the sidewalks and in the street between their respective places of business, John Francis and E. Naufal and Sadie Naufal had some argument and harsh words concerning

their differences; that about 1 o'clock this argument was renewed between E. Naufal and John Francis, whereupon John, with belligerent words and attitude, started across the street towards Naufal, who was on the sidewalk in front of his place of business.

From this point on to the close of the tragic affair the testimony of the state and the testimony of the defendant is more or less conflicting. According to the state's testimony, John called Naufal a vile name, and John and his father, defendant here, went across the street and followed Naufal into his store, where they and Sadie Naufal engaged in a fight, and that A. Francis was armed with a small club or black-jack when he entered the store; that during the fight Naufal called to Sadie to get a gun and help him, and that he was then struck by defendants and rendered unconscious; that he was roused from his unconscious condition by the sound of a gunshot, and that he then saw A. Francis discharge a pistol at Sadie Naufal, his wife, resulting in her almost instant death; that A. Francis then dropped the pistol and fled from the store; that at the same time John in some manner got away also. Naufal then picked up the pistol, which he recognized as his own, and carried it back into his living room at the rear of the store and put it into his bed, where it was later found by the officers, with two chambers empty. After so disposing of his pistol, Naufal rushed out into the street, excitedly crying: "They have killed my wife! They have killed my wife!"

The testimony of the defendant A. Francis, corroborated in material parts by thirteen other witnesses, was that when he saw that his son John and Naufal were about to engage in a fight he ran into the street where John was, remonstrating with him and attempting to hold him, but that John broke away and pursued Naufal into his store; that he followed

John, and that he and Sadie separated John and Naufal, who were then fighting; that John was knocked down near one side of the front of the store, and that Naufal was partially down near the cash register on the other side, when he got a gun from somewhere about the cash register and fired two shots, one of which penetrated John's shoulder and the other hit Mrs. Naufal, causing her death; that while the shots were being fired both John and A. Francis were retreating; and that they ran across the street to their own place of business.

There were double doors in the front of the Naufal store, which were open at the time of the tragedy, and the balance of the front was glass display windows. A number of witnesses, attracted by the preliminary quarrel, testified that they saw all or a portion of the difficulty from the outside. A number of witnesses testified that immediately after the shooting Naufal, gesticulating with his hands in an excited manner, walked out into the street, exclaiming: "Mein Gott, I've killed my wife, Sadie! I've killed my wife!" When questioned by the officers, Naufal denied that he had a gun; the officers recovered the gun by breaking into the Naufal sleeping room, where they found it in a bed next the mattress, covered with bedclothing. There is no dispute that the gun from which the fatal shot was fired belonged to Naufal, and there is no evidence that defendant Francis was armed with a gun at any time during the trouble. There was some conflicting evidence to the effect that he was armed with a club or blackjack.

Naufal was first arrested for the killing of his wife, but was discharged at his preliminary examination.

The testimony of the witness Nova Mosleh, which was practically the only evidence corroborating the testimony of Naufal, was thoroughly impeached by a number of witnesses,

who testified that she did not reach the scene of the tragedy until it was all over. Her veracity was impeached further by the direct testimony of the county attorney, who testified on behalf of the defendant; there is also direct testimony to the effect that Naufal paid her to testify as she did. A part of the testimony of the county attorney is as follows:

"Q. What is your name? A. Earl Foster.

"Q. You are county attorney of Creek county? A. Yes, sir.

"Q. Some time after the Francis preliminary hearing at the city of Drumright, do you remember the occasion of myself and Mrs. Nova Mosleh, one of the witnesses used at that hearing for the state, coming to your place one Sunday afternoon? A. I do.

"Q. Do you remember that this affidavit was produced to you and read by you on that occasion? A. I remember it being produced to me; I don't remember, Mr. Lytle, whether I read it on that occasion or not. I will state further, however, that I knew the contents of it at that time; I had seen it before. I may have read it; I don't remember.

"Q. In answer to a question by either you or myself, is it not a fact that Mrs. Nova Mosleh made the statement that she was not present at the shooting of Sadie Naufal and didn't see anything of the difficulty which resulted in the death of Sadie Naufal, and that her evidence given at the Francis preliminary hearing was false and untrue? A. Yes, sir; she stated that, or that in substance, in answer to questions propounded by myself or you.

"Q. State, in substance, what you said to her. A. I told her that I thought that any one who would testify to a falsehood, go on the witness stand and perjure themselves, was a great deal worse than murder or anything else. I was pretty mad at the time, and I talked to her pretty rough, and asked her why and for what reason she went upon the witness stand and testified the way she did if it wasn't the

truth, and she told me that Naufal had offered her some rent on her house or had given her some rent on her house, or something of that kind, and I asked her if that was the only reason she went upon the stand and testified to the facts that she did in the preliminary, and asked her if there was any other reason, and she said, 'No,' that there wasn't any other. That he had just given her—we figured it up, and it amounted to something like $75 or $80 in rent, that he had promised to give her. I believe I used words that she used and she wanted to correct her statement and wanted me to dismiss the case; that she was lying about it. There wasn't anything to do, and I told her she would have to come upon the witness stand before the judge so he could hear her testimony, and that I would have to take it up with the court in Drumright before I would dismiss the case upon her coming out there. I believed that was the substance of our conversation.''

The foregoing are the outstanding facts, gleaned from a careful reading of all the testimony in this case. To give all the details bearing upon this tragedy would extend this recital, to no good purpose.

The material assignments of error urged by the defendant may be stated as follows:

1.  That the evidence is insufficient to support the verdict.

2.  That the verdict of the jury was obtained by improper influence, amounting to coercion.

3.  That the court erred in excluding the testimony of Mrs. Earl Anderson.

The Attorney General has confessed error, on the ground that the evidence for the state and the evidence as a whole is clearly insufficient to support the verdict. Ordinarily, this court is averse to reversing a case purely on the insufficiency of the evidence. In this case, however, a careful consideration

of the whole record leads us to overcome this hesitancy and agree with the Attorney General.

The testimony shows, beyond all question of doubt, that the pistol or revolver with which John Francis and Sadie Naufal were shot belonged to E. Naufal, the husband of Sadie, and that the same was procured from the Naufal premises by either Naufal or his wife during the progress of the fight; that the pistol, when found by the officers, contained four steel jacket bullets or cartridges; and that two of the chambers were empty, showing recent explosions. The bullet which passed through the head of Sadie Naufal was picked up from the floor just after the tragedy and was a steel jacket bullet, corresponding exactly with those in Naufal's pistol found in the bed where he confessed to hiding it; the bullet which was extracted from the shoulder of John Francis some weeks after the shooting also corresponded exactly with those in Naufal's pistol. Naufal at first denied having or owning a gun, but later admitted that he had picked the pistol up from Sadie's side after she was killed and placed it in the bed.

There were no witnesses in the store except the participants in the fight. The quarrel in the street and the fight in the store attracted the attention of a great number of people, who assembled in front of the store on the outside. The testimony of the witnesses E. Naufal, Will Ary, Tony Saffa, Paris Saffa, Mrs. Tony Saffa, and Mrs. Armstead was to the effect that, after Naufal had taken the pistol and placed it in the bed, he came out on the street and cried, "They've killed my wife!" or words to that effect. Witnesses R. F. North, Oma North, Grace Engle, Cora Engle, E. Gardner, A. B. Patterson, and Isaac Swaydon testified in effect that Naufal exclaimed, "I've killed my wife!" After the fatal tragedy, Naufal told witness Whitehead, "I don't know how it happen-

ed." He told Paul Saffa: "I had the gun. I don't know who shot Sadie." He told Mrs. Paul Saffa: "I didn't mean to kill her; I was trying to shoot Francis."

On the witness stand Naufal related the following story: That after John Francis and A. Francis had knocked him down he became unconscious (which, of course, was reasonable), but that just before he lost consciousness he told his wife to go and get the gun; that the next thing he knew a shot was fired, which roused him to consciousness; that presumably that shot was fired by the deceased, and the bullet hit John Francis; that he then saw the defendant A. Francis wrench the pistol away from his wife, Sadie, shoot her with the gun, and then threw the gun down by her side and run away from the scene. Then, instead of permitting this affair to remain as susceptible of proof as possible under the circumstances, he took the pistol with which his wife was killed, hid it in a bed, and denied the ownership or any knowledge of the pistol.

All of those directly interested in this tragedy were Syrians, as were most of the witnesses. Racially, these are a Semitic people from the regions of Palestine, where there is a heterogeneous population mixed with Kurds, Arabs, Hebrews, and other Eastern tribes, a people of excitable natures and violent passions, against whom the people of this country have a more or less natural antipathy.

Considering all the testimony in connection with the remarkable story told by Naufal, along with the physical facts proved and about which there is no controversy, we conclude that the evidence is wholly insufficient to support the verdict. On the contrary, the evidence indicates that Naufal and not Francis did the fatal shooting.

Defendant complains that there was error in keeping the jury together for 96 consecutive hours in deliberation over

their verdict. To fully appreciate this length of time, in connection with our 8-hour labor day, it amounted to 12 working days. Defendant claims that this amounted to coercing the jury and forcing them to bring in a compromise verdict; that such verdict was not the result of calm deliberation and reason, but was the outcome of a contest of physical endurance. The long period of deliberation was unusual, but there is no showing made that the jurors were improperly admonished or that their confinement was particularly irksome or vexatious. Under the provisions of section 5975, R. L. 1910, the court may discharge a jury when it satisfactorily appears that there is no reasonable probability that the jury can agree on a verdict. The record here does not, further than a mere suspicion, show any abuse of discretion in holding the jury together for such length of time, or that such action amounted to coercion.

The next question presented is: Did the court err in excluding further testimony of Mrs. Earl Anderson, as disclosed by the record as follows:

"Q. Do you remember the occasion of the death of Sadie Naufal? A. Yes, sir; I do.

"Q. Were you occupying any official position at that time? A. Yes, sir.

"Q. What was that? A. I was secretary and treasurer of the Council of Defense of Creek County and also Food Administrator for Drumright and vicinity.

"Q. On or about that occasion did you see Mr. E. Naufal? A. I saw him that evening.

"Q. What were the circumstances under which you saw him? A. My husband brought him to our house.

"Q. What official position, if any, did your husband occupy? A. Deputy Sheriff.

"Q. Did you on that occasion have any conversation with E. Naufal as to the circumstances of the death of his wife? A. I had a very short conversation.

"Q. What was that conversation?

Mr. Foster: Objected to as incompetent, irrelevant, and immaterial.

The Court: Objection is sustained.

"Q. Did you on that occasion ask Mr. Naufal how his wife came to her death?

Mr. Foster: Objected for the same reason.

"Q. And did he answer, in substance, that she came to her death by accident?

Mr. Foster: Objected to for the same reason.

The Court: State in what particular you object, state the reason for your objections.

Mr. Foster: It is incompetent, irrelevant, and immaterial, and it makes no difference; I will withdraw the objection.

"Q. You may answer yes or no. A. No, sir; I didn't ask him how his wife came to her death.

"Q. Did he state to you in substance how she came to her death?

Mr. Burns: We object to that.

The Court: Objection is sustained.

This was an abortive attempt to impeach the prosecuting witness, Naufal. The witness on the stand was a reputable person, in whom the community had lodged governmental and patriotic duties, and her answer, had it been to the effect that Naufal told her that Sadie was shot accidentally, would have been very important. But we do not know, except perhaps inferentially, what her answer would have been, and there was no sufficient offer made to show its competency, or

that Naufal had in fact made a declaration at variance with his statements under oath. In the absence of a more definite offer and showing, the court committed no error in sustaining the objections made.

There were several minor irregularities in this trial to which no exceptions were taken, and which may therefore be considered as waived. The instructions fairly cover the law of the case, and none were offered by the defendant to cover any issue not fully stated by those which were given. We find no fundamental error in the conduct of the trial and any not fundamental were waived, with the exception that under the evidence the verdict should be "Not guilty."

We think the evidence is so palpably insufficient that the trial court should have set the verdict aside and granted a new trial. Out of considerations of expediency, trial courts sometimes pass the question of the sufficiency of the evidence to the appellate court in cases where it should have been more seriously considered in the court below.

Reversed and remanded.

DOYLE, P. J., and MATSON, J., concur.